**CALIFORNIA FORESTRY ASSOCIATION,**
**Appellant,**

v.

**UNITED STATES FOREST SERVICE**
**and Jack Ward Thomas, Chief, United**
**States Forest Service, Appellees.**

No. 96–5039.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 28, 1996.

Decided Dec. 31, 1996.

**610**

Robin L. Rivett, Sacramento, CA, argued the cause for appellant.

Michael S. Raab, Attorney, U.S. Department of Justice, Washington, DC, argued the cause for the appellees. Frank W. Hunger, Assistant Attorney General, Eric H. Holder, Jr., U.S. Attorney, and Mark B. Stern, Attorney, U.S. Department of Justice, Washington, DC, were on the brief.

Before: WALD, HENDERSON and ROGERS, Circuit Judges.

Opinion for the court filed by Circuit Judge HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

The appellant, California Forestry Association (CFA), seeks to enjoin the United States Forest Service (Forest Service) from relying on a study produced by the Sierra Nevada Ecosystem Project (SNEP). CFA claims that SNEP failed to comply with the requirements of the Federal Advisory Committee Act (FACA), 5 U.S.C. app. 2. The district court granted the Forest Service's motion for summary judgment,[1] holding that SNEP is not subject to FACA because the study it produced was primarily intended for the use of the United States Congress. CFA argues on appeal that because the Forest Service intended to use the SNEP study and directed a large amount of discretionary funding to

SNEP, FACA is applicable notwithstanding the fact that the study was also prepared for submission to the Congress. We agree. Accordingly we reverse the grant of summary judgment to the Forest Service, grant CFA's cross-motion for summary judgment and remand to the district court to fashion an appropriate remedy.

## I.

For fiscal year (FY) 1993 Congress appropriated approximately $184 million to the Forest Service for "forest research." Department of the Interior and Related Agencies Appropriations Act, 1993, Pub.L. No. 102–381, 106 Stat. 1374 (1992) (1993 Appropriations Act or Act). Neither the 1993 Appropriations Act nor the Forest Service's appropriations request for FY 1993 specifically provided for forest research funding to be spent on a study of the Sierra Nevada. The conference report accompanying the Act did, however, allocate $150,000 for the "scientific review of the remaining old growth in the national forests of the Sierra Nevada ... and for a study of the entire Sierra Nevada ecosystem ... by an independent panel of scientists, with expertise in diverse areas related to this issue." H.R. Conf. Rep. No. 102–901, at 48 (1992).

In October 1992, the Forest Service sought direction from the Congress on how to proceed with the Sierra Nevada research. In response the Forest Service received two letters from various congressmen. One letter, signed by eight members, including the chairmen of the Committee on Natural Resources, the Committee on Agriculture and the Committee on Merchant Marine & Fisheries as well as the chairmen of several subcommittees, stated that the appropriation was to finance an independent panel of scientists to review the old growth in the Sierra Nevada as well as the ecosystem of the Sierra Nevada as a whole. The letter acknowledged that the $150,000 appropriation was insufficient for such a study and that the signers of the letter intended to seek further

---

**1.** CFA also moved for summary judgment, which was denied and from which denial CFA also appeals.

appropriations in the future. In the meantime the $150,000 was to be used to fund an interim six-month study on the old growth in the Sierra Nevada. The letter made clear that the Congress was to be the recipient of the study. JA 274 ("This study should provide the Congress with the comprehensive data needed to make important policy decisions concerning future management of the Sierra Nevada forests."). The other letter was signed by four congressmen and called for an ecosystem-wide study of the Sierra Nevada and submission of a report to the Congress.

After receiving the two letters the Forest Service formed SNEP, consisting of a Steering Committee and a Science Team. The six-member Steering Committee was composed of two Forest Service officials, one representative from the National Park Service and three non-governmental individuals. The Steering Committee selected the leader of the Science Team and, together with the leader, appointed the other eighteen members of the Science Team. The Science Team was comprised of a mix of individuals from federal agencies, state universities and one private university.

The Steering Committee set SNEP's budget at approximately $7 million allocated over a three-year period in the following manner: approximately $1 million for FY 1993, approximately $3.5 million for FY 1994 and approximately $2.4 million for FY 1995. Because the congressional appropriation for FY 1993 totaled only $150,000 SNEP faced a budget shortfall of approximately $850,000 in its first year. The Forest Service made up the shortfall by budgeting from existing Forest Service funds. For FY 1994 and FY 1995 SNEP's proposed budgets were submitted to the Congress as part of the Forest Service's appropriations requests. SNEP submitted its final report to the Congress in June 1996.

In district court CFA sought a declaratory judgment that SNEP is an advisory committee subject to the requirements of FACA and an injunction prohibiting the Forest Service from relying on the final report. On cross-motions for summary judgment the district court granted the Forest Service's motion, concluding that SNEP is not subject to the requirements of FACA.[2]

## II.

A committee is subject to the provisions of FACA if it is

(A) established by statute or reorganization plan, or

(B) established or utilized by the President, or

(C) established or utilized by one or more agencies,

in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government.

5 U.S.C. app. 2, § 3(2). All parties agree that SNEP was established by an agency as set forth in subsection (C) because it was established by the Forest Service. The only issue is whether SNEP was established "in the interest of obtaining advice or recommendations for the [Executive Branch]."

We conclude that the circumstances of SNEP's genesis support an inference that SNEP was in fact established "in the interest" of advising an agency and therefore is subject to FACA. As the district court expressly found, "SNEP's work product will serve an essential element of the Forest Service's long-term plan for ecosystem management." *California Forestry Ass'n v. United States Forestry Serv.*, No. 95–01116, Mem. Op. at 10 (D.D.C. Dec. 22, 1995), (Mem. Op.). Moreover, a briefing paper submitted to the Congress during the 1994 fiscal year budget process stated in part:

[SNEP] is part of our continuing effort to develop a strong ecosystem management program and ethic *for the Forest Service.* Over the last several years we have been

2. If SNEP is subject to FACA it has to meet a host of procedural requirements. For example, it must publish meeting notices in the Federal Register, permit interested persons to attend meetings or file statements and make all records of meetings publicly available. *See* 5 U.S.C. app. 2, § 10. It is uncontested that SNEP failed to comply with the procedural requirements of FACA.

developing and expanding the use of science based assessment to assist in the development of sound resource and management policies.... These assessments provide Congress *and agency leadership* a means and opportunity to view the latest credible scientific evidence to intelligently manage our Nation's natural resources.

Forest Service Research Briefing Paper for FY 1995 Rescission Hearing 2 (Jan. 18, 1995), *reprinted in* JA 200–13 (emphasis added). In addition, minutes of Science Team meetings show that the Science Team viewed the Forest Service as a user of its work product. *See* Mem. Op. at 10 (" 'Agency links and information infrastructure were briefly discussed as another key issue, with the handing off of SNEP data base and tools to the [Forest Service] ... at the end of our process.'" (quoting SNEP Science Team Minutes for Jan. 31–Feb. 1, 1994, at 5–6)). Finally, it appears that the Forest Service is currently using the SNEP study in developing its California Spotted Owl Revised Draft Environmental Impact Statement. *See* Mem. to Jack Ward Thomas, Chief of the Forest Service (Sep. 4, 1996), *reprinted in* Appellant Reply Br., Attach. A. It thus seems clear to us that the SNEP study was intended for Forest Service use and that the Forest Service has made use of the SNEP report for its own purposes.

The Forest Service contends that even if it intended to use and is actually using the SNEP study, FACA nonetheless does not apply because the Congress, and not the Forest Service, was the *primary* intended recipient of the SNEP study. The Forest Service relies on our decision in *Sofamor Danek Group, Inc. v. Gaus*, 61 F.3d 929, 934 (D.C.Cir.1995), *cert. denied,* — U.S. ——, 116 S.Ct. 910, 133 L.Ed.2d 841 (1996), in which we held that FACA does not apply if Executive Branch use of a committee's work product is "subsequent and optional" in relation to the use by a non-Executive Branch entity. The 1993 Appropriations Act did not specify the recipient of the study as either

the Congress or an agency in the Executive Branch. Because the statute is silent on the point, the Forest Service points to the legislative history to support its position. First, the Forest Service relies on the two letters already discussed, which were signed by twelve congressmen *in toto* and which indicated that the Congress was to be the recipient of the SNEP study. Second, the Forest Service attempts to rely on the fact that one of the letters and a statement made by then-Representative Leon Panetta on the floor of the House of Representatives indicate that the study of the Sierra Nevada was to be conducted in accord with H.R. 6013, 102d Cong. (1992), a bill which was approved by the House Committee on Agriculture but was never considered by the full House. Under the provisions of H.R. 6013 a report on the Sierra Nevada ecosystem was to be submitted to certain House and Senate committees, presumably for their use,[3] as well as to the Secretary of the Department of Agriculture and the Secretary of the Department of the Interior for publication. H.R. 6013 also provided that the committee producing the report on the Sierra Nevada ecosystem "shall not be subject to the Federal Advisory Committee Act." *Id.* § 3(c)(9).

We disagree that the legislative history demonstrates that the Forest Service's use of the SNEP study is "subsequent and optional" within the meaning of *Sofamor. Sofamor* involved the actions of the Agency for Health Care Policy and Research (AHCPR) which the Congress established in 1989. The Congress expressly authorized AHCPR by statute to convene panels of experts to produce guidelines on various health issues intended for use by non-governmental officials such as physicians and educators. In the accompanying conference report the joint conferees stated that they intended the guidelines to be used by the Health Care Financing Administration (HCFA), which administers the Medicare and Medicaid programs. *See Sofamor,* 61 F.3d at 935 n. 33. The AHCPR established the Low Back Panel to develop guide-

---

**3.** H.R. 6013 did not recite the use to which congressional committees might put the report. Rather, it simply stated without further explanation, "[T]he reports ... shall ... be submitted to the Committees on Interior and Insular Affairs and Agriculture of the House of Representatives and to the Committees on Energy and Natural Resources and Agriculture; Nutrition, and Forestry of the Senate." *Id.* § 7.

lines regarding low back disorders. Sofamor Danek, a manufacturer of medical devices, sought declaratory and injunctive relief claiming that the Low Back Panel was subject to FACA because the Congress intended an Executive Branch agency (HCFA) to use the guidelines. We rejected the argument as follows:

> Sofamor Danek's dual-purpose contention fails to appreciate the distinction noted by Congress when enacting FACA between the purpose for establishing a committee and the government's subsequent and optional use of a committee's work product.

*Id.* at 934.

At issue in *Sofamor* was the statutory text indicating that guidelines drafted by expert panels were to be used by nongovernmental health care personnel.[4] Because the statute designated the primary user, we concluded that HCFA's use of the Low Back Panel's work product was subsequent and optional. *See id.* at 935 ("Congress expressly stated the purpose for the establishment of the panels—improving health care by developing, reviewing, and updating guidelines for use by clinical health care practitioners. In light of that express purpose, the court will not lightly infer any other purpose...."). Here we have no similar statutory directive. In the absence of a statutory directive, and in light of the evidence supporting the conclusion that SNEP was established in the interest of advising the Forest Service, we cannot conclude that the Forest Service's use of the study is merely subsequent and optional.

CFA raises one additional argument. A committee is subject to FACA if it is "established *or utilized* by one or more agencies, in the interest of obtaining advice or recommendations for the [Executive Branch]." 5 U.S.C. app. 2, § 3(2) (emphasis added). CFA claims that even if SNEP was not "established" within the meaning of FACA it has nonetheless been "utilized" under the statute and therefore is subject to the procedural requirements of FACA. The district court held that the terms "establish" and "utilize" under FACA "are exclusive, i.e., that only one of these possibilities can be realized in any given instance." Mem. Op. at 14 n.7 (citing *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989); *Food Chem. News v. Young*, 900 F.2d 328, 332–33 (D.C.Cir.1990)). CFA argues that *Public Citizen* does not support the district court's interpretation of the terms "established" and "utilized" as exclusive. In light of our holding that the Forest Service "established" SNEP "in the interest of obtaining advice or recommendations," 5 U.S.C. app. 2 § 3(2), we do not reach either CFA's alternative argument relying on the "utilized" language of the statute or the district court's rejection of that argument.

### III.

Because we conclude that SNEP is subject to the requirements of FACA we reverse the district court's grant of summary judgment to the Forest Service and grant CFA's cross-motion for summary judgment. CFA also seeks an order enjoining the Forest Service from relying on the SNEP report. We are unable to determine the propriety of injunctive relief at the summary judgment stage because the district court has yet to make factual findings. For example, the Forest Service contends that even though the SNEP study was not produced in compliance with FACA, CFA will not be aggrieved by the Forest Service's use of the study in any rulemaking because the rulemaking will be subject to full notice and comment and ultimately to judicial review. In response CFA contends that it has already been denied an adequate opportunity to review the scientific

---

**4.** The statute authorized AHCPR to ensure:

> the development and periodic review and updating of—
> (1) clinically relevant guidelines that may be used by physicians, educators, and health care practitioners to assist in determining how diseases, disorders, and other health conditions can most effectively and appropriately be pre-

vented, diagnosed, treated, and managed clinically; and
> (2) standards of quality, performance measures, and medical review criteria through which health care providers and other appropriate entities may assess or review the provision of health care and assure the quality of such care.

42 U.S.C. § 299b–1(a).

evaluations used to produce the report, the underlying evaluations are not now effectively reviewable and the integrity of the report has therefore been irreparably compromised. We cannot assess these competing claims at this stage and therefore remand to the district court to fashion an appropriate remedy in the first instance. *Cf. CC Distribs., Inc. v. United States,* 883 F.2d 146, 156 (D.C.Cir. 1989) (district court's dismissal of action for lack of standing reversed and remanded to evaluate advisability of preliminary injunction).

Courts that have considered the availability of injunctive relief to remedy FACA violations have reached different results. *Compare Alabama–Tombigbee Rivers Coalition v. Department of the Interior,* 26 F.3d 1103, 1106–07 (11th Cir.1994) (affirming award of injunctive relief) *with National Nutritional Foods Ass'n v. Califano,* 603 F.2d 327, 336 (2d Cir.1979) (affirming denial of injunctive relief). We acknowledge that an injunction might be appropriate in some cases, and perhaps even in this case, if the unavailability of an injunctive remedy would effectively render FACA a nullity. On remand, however, the district court should inquire whether under the circumstances an injunction would promote FACA's purposes. The preparation of the report has already consumed millions of dollars. If the Forest Service needs a scientific evaluation of the Sierra Nevada for its own use, an injunction prohibiting its use of the SNEP study would require it to commission another (presumably duplicative) study of the Sierra Nevada. That result would not meet FACA's aim to "reduce wasteful expenditures." *Public Citizen,* 491 U.S. at 459, 109 S.Ct. at 2569. A second purpose of FACA is to "enhance the public accountability of advisory committees established by the Executive Branch." *Id.* The record indicates that at least some of the Science Team meetings were open to the public. Furthermore, SNEP made other efforts to keep the public informed—it published newsletters and provided information to a "key contacts group" comprised of eighty-seven individuals and representatives of various organizations, including CFA. The need for injunctive relief may be reduced where, as here, there has been at least some attempt to ensure public accountability.

For the foregoing reasons we reverse and remand to the district court for further proceedings consistent with this opinion.

*So ordered.*